### FENNER et al. v. SPARKS.

No. 22883.   Oct. 23, 1934.

Rehearing Denied Jan. 8, 1935.

Application for Leave to File Second Petition for Rehearing Denied Feb. 12, 1935.

Philip Kates, for plaintiffs in error.

Hunt & Eagleton, for defendant in error.

RILEY, C. J. Plaintiffs in error were, at the time the controversy arose, copartners doing a brokerage business with principal offices in New York City, N. Y., and New Orleans, La., and a branch office in Tulsa, Okla. The firm name was Fenner & Beane, and in that name it was a member of the Stock Exchange of New York City. Defendant in error was a customer of said firm dealing through their branch office in Tulsa. He was plaintiff in the trial court, and the parties are herein referred to as there.

Plaintiff placed an order with defendant on September 27, 1929, for the purchase of 100 shares of Montgomery Ward stock at $121 per share. It seems agreed that this was to be a cash transaction, the stock when purchased by defendants to be sent to a bank in Tulsa, Okla., with draft attached for the purchase price, plus the amount of the broker's commission. The order was executed by defendants and the stock sent to the bank with draft attached. The draft, however, was for $18,280.41, which apparently included the purchase price of other securities. Just when the Montgomery Ward stock with draft attached arrived at Tulsa does not appear.

On October 11, 1929, plaintiff placed an order with defendant at its Tulsa branch office to sell 100 shares of Montgomery Ward stock at $114 per share. The order was given at 8:29 a. m. Tulsa time, which was 10:29 a. m. New York time. The order was accepted and transmitted to the New York office, arriving there by wire at 10:31 a. m.

New York time, or within two minutes after it was given in Tulsa.

Plaintiff was present in the Tulsa office, were telegraphic reports of the New York stock exchange were being received, and was observing said reports as they came. It appeared therefrom that there were sales made of Montgomery Ward stock on the New York Exchange at or above $114 for some 20 or 30 minutes after plaintiff's order had been accepted and transmitted to New York. Therefrom plaintiff, as well as the agents of defendant at Tulsa, appear to have assumed that plaintiff's stock had been sold. But plaintiff, receiving no confirmation of sale, wired for confirmation, whereupon he was informed that the sale had not been effected for the reason that Montgomery Ward stock had not sold and could not be sold at $114 on the stock exchange in New York after the receipt of plaintiff's order to sell.

The market price continued to decline, said stock selling on the next business day on the New York Stock Exchange at a high of $111⅝ to a low of $108½. It never did again sell for $114.

Plaintiff was dissatisfied with the transaction, and claimed that defendant should have made the sale at $114, and accused defendant of being responsible for his loss on said stock from $114 per share down.

In the meantime some other stock, with draft attached in the sum of $6,382.08, had arrived at the bank in Tulsa. Plaintiff declined to pay the drafts and take up the stock.

Plaintiff pleads that a controversy arose between plaintiff and defendants concerning the failure of defendants to sell the stock; that thereafter, on October 16th, an oral compromise and agreement was entered into between himself and defendants, defendants "acting by and through their duly authorized and acting agents, L. S. Moore and C. A. Fleetwood, whereby plaintiff should advance $3,500 and defendants would advance the balance necessary to take up the draft representing the purchase price of the 100 shares of Montgomery Ward stock at $121 per share, certain other securities, and that defendant would hold the 100 shares of Montgomery Ward stock until it could be sold for $114 per share, and that in all events defendant would protect plaintiff against any loss on the sale of said stock at a price less than $114 per share." That plaintiff performed all his part of such agree-

ment, put up the $3,500, and the 100 shares of stock and the other securities; that defendant furnished the money it agreed to furnish and the draft was taken up; that in violation of the agreement defendants thereafter on October 24, 1929, over the objection of plaintiff, sold said Montgomery Ward stock for $83 per share, or $3,100 less than they had guaranteed to him, to his loss and damage in said sum, for which amount he prayed judgment.

Defendant answered by unverified general denial. Trial was had to the court without a jury, resulting in a judgment for plaintiff in the sum of $3,100, and defendants appeal.

There are some ten specifications of error, but what defendant terms the "basic errors of the trial court are (1) its finding that Moore entered into the alleged agreement with Sparks by direction of or authority from Fenner & Beane; (2) that a consideration passed to support the agreement, if made"; and "The conclusion that Moore, under the pleading and evidence, had authority to make, and received consideration for, a contract not to sell the Montgomery Ward stock at less than $114 a share, and in failing to find that the agreement was not made by Moore; that there was no proof of his authority to bind the firm; that there was no consideration for the alleged contract, and that such findings should have been made, and judgment should have been entered thereon for defendants."

Finding of fact, made at the request of defendants, included a finding that a controversy arose between plaintiff and defendant out of the failure of defendants to sell the 100 shares of Montgomery Ward stock at $114 per share, and that the parties reached a compromise and settlement of said matter whereby the plaintiff put up the 100 shares of Montgomery Ward stock and other securities and $3,500 in cash, and defendants advanced the sum of $8,600, making the amount necessary to take care of the draft for $12,100, the original purchase price of the 100 shares of Montgomery Ward stock, and that "in consideration of plaintiff putting up this stock and money, the defendants agreed to protect plaintiff from any loss on the 100 shares of Montgomery Ward stock below $114 per share."

The evidence on the question of whether or not the oral contract was entered into whereby defendants agreed to protect plaintiff against any loss in the sale of the 100

shares of Montgomery Ward stock at a price less than $114 per share, was in direct conflict. The finding of the trial court on this controverted question of fact is therefore binding on this court the same as the verdict of a jury.

The remaining questions are as to the authority of the agent, Moore, to bind defendants, if he did make such an agreement for them, and if such authority was admitted or proved, whether there was any consideration for such contract.

The trial court concluded as a matter of law that under the pleadings the authority of the agents to do and perform all the acts and things alleged in plaintiff's petition, and to make the contract in question, was admitted.

In this holding there was no error. Plaintiff alleged in his petition that the contract was made by defendant, acting by and through its "duly authorized and acting agents", naming them. The answer of defendants was not verified. Therefore, under the provisions of section 220, O. S. 1931, failure to deny the allegations of authority of the agent under oath was equivalent to an admission. No proof of the agent's authority was required.

In Gaar, Scott & Co. v. Rogers, 46 Okla. 67, 148 P. 161, it is held:

"A general allegation of an authorized agency, not denied under oath, will be presumed to be an agency with such power and authority as is charged in the pleading, and no further proof of the agent's authority will be required."

To the same effect is Knudson v. Fenimore et al., 69 Okla. 3, 169 P. 478.

Hilsmeyer v. Blake, 34 Okla. 477, 129 P. 1129, is cited by defendants as stating a contrary rule. A different question was there involved. The question of alleged authority of an agent to act for a principal was not involved.

Attention is called to a number of cases citing with approval the Hilsmeyer Case, but an examination thereof shows that in each case a different question arising under the Hilsmeyer Case was under consideration, and none of such cases are in point.

As to the question of consideration, section 9440, O. S. 1931, provides:

"Any benefit conferred, or agreed to be conferred upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise."

Section 9441, O. S. 1931, provides that:

"An existing legal obligation resting upon the promisor, or a moral obligation, originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

Here the promise relied upon was that defendant, having failed to sell the stock for $114 per share, would protect plaintiff against such loss on said stock by sale at less than $114. The inquiry is: What, if anything, was given, assigned, or promised by plaintiff in return for this promise? Was it that plaintiff put up the $3,500, in cash and other securities and take up the draft for $12,100? Certainly not, for he was already under legal obligation to take up the draft. Was it that plaintiff put up or deposit with defendant the 100 shares of Montgomery Ward stock and other securities? We think not, for the only reasonable conclusion that may be drawn from all the evidence is that plaintiff did this to secure defendant for the $8,600 which defendants advanced to take up the draft.

Defendants were clearly entitled to this benefit independent of any promise made to secure plaintiff against possible loss in the final sale of the stock. Then, what prejudice, if any, did plaintiff suffer or agree to suffer, other than such as he was at the time lawfully bound to suffer, as an inducement to defendants, the alleged promisors?

The contention is that plaintiff surrendered or gave up what he considered a valid claim against defendants for loss sustained by him in the failure of defendants to properly represent plaintiff and sell the stock at $114, and that this was a "good faith controversy which Sparks had with them."

"A doubtful or disputed claim, sufficient to constitute a good consideration for an executory contract of compromise has been defined as one honestly and in good faith asserted, arising from a state of facts upon which a cause of action can be predicated, with reasonable belief on the part of the party asserting it that he has a fair chance of sustaining his claim, and concerning which an honest controversy may arise, although in fact the claim may be unfounded." 5 R. C. L. 881.

This rule was in principle recognized in First Natl. Bk. of Calumet v. Rodgers, 130 Okla. 146, 265 P. 1049.

In this case the claim asserted by plaintiff arose out of the apparent negligence of defendants to effect a sale of plaintiff's stock on the New York Exchange at a price of $114 per share, when the telegraphic reports being received at the branch office in Tulsa showed or indicated that sales of Montgomery Ward stock were made at or above said price for some 20 or 30 minutes after defendants received the order to sell at their New York office. It afterwards developed that the telegraphic reports being received at the Tulsa branch office were in fact reports of sales and transactions that had actually taken place before the order to sell was given in Tulsa, and that the "ticker tape" or reports of sales made were running some 30 minutes or more late. That is, a sale or transaction made did not appear in the "tape" for some 30 minutes or more. Montgomery Ward stock never did in fact sell at or above $114 after the order to sell was placed in Tulsa, or at more after the order was received in New York, two minutes after it was placed in Tulsa. So, in fact, it could hardly be said that defendants were at fault in the matter or that they had been in the least degree negligent in handling the order to sell. But there is nothing in the record to indicate that plaintiff was aware of these facts at the time of the alleged compromise agreement or that he knew or had reason to believe at the time that the claim he was asserting against defendants was not well founded.

If plaintiff, in fact, abandoned or agreed to abandon this claim, although it might have ultimately proved to be without merit, it was under the above rule and under the statutes a good consideration for the promise made by defendants.

There is some claim that though the agreement was made as claimed by plaintiff, it would be a change or modification of a prior written contract between the parties concerning their stock transactions, and that a written contract may not be altered or modified by an oral agreement.

The rule contended for goes only to the extent that a written contract may not be changed or modified by an executory oral contract or agreement.

It is well settled that a written contract may be effectively modified by executed oral agreement. In this case the oral agreement was fully executed on the part of plaintiff.

Judgment affirmed.

SWINDALL, McNEILL, BUSBY, and WELCH, JJ., concur. CULLISON, V. C. J., and ANDREWS, OSBORN, and BAYLESS, JJ., absent.