## HAMEL et al. v. TORONTO INV. CO. et al.

No. 33400. March 21, 1950.

*216 P. 2d 319.*

G. C. Spillers and G. C. Spillers, Jr., both of Tulsa, for plaintiffs in error.

Rosenstein, Fist & Shidler, H. L. Smith, and Leslie Webb, all of Tulsa, for defendants in error.

ARNOLD, V. C. J. This is a suit in equity to enforce specific performance of an option to purchase agreement contained in a 99-year lease executed by the defendants and plaintiffs on the 12th day of August, 1936, covering part of lot 7 in block 88, in the city of Tulsa as shown by the original plat thereof.

The facts and circumstances out of which this litigation arose had their beginning in 1928, at which time the Quaker Investment Company, a corporation owned by A. J. Hamel, C. L. Waite, and Fannie C. Waite, held title to the real estate here involved in undivided interests, A. J. Hamel owning 62½ per cent and C. L. Waite and Fannie C. Waite owning 37½ per cent. C. W. Bliss, an experienced hotel man, desired to construct a building for hotel purposes theron, and negotiations between these parties with this object in view resulted in C. W. Bliss and his mother, Mrs. T. B. Bliss, organizing two corporations, one a building corporation called the Toronto Investment Company and the other an operating corporation known as the Bliss Hotel Company. On the 6th day of June, 1928, the Quaker Investment Company executed a 99-year lease to the Toronto Investment Company for the purpose of erecting a 10-story hotel building on the lot to be operated and conducted by the Bliss Hotel Company. C. W. Bliss was president of both of these corporations and subsequently became manager of the Bliss Hotel.

After these preliminary matters had been worked out by the parties, Mr. Bliss and his mother put in approximately $150,000 into the construction fund and the two corporations headed by Mr. Bliss procured a loan of $300,000 from the Exchange National Company of Tulsa and $50,000 from the Exchange Trust Company of said city, these loans being secured by first and second mortgages upon the hotel property. The ground owners joined in the execution of these mortgages but were not required to and did not sign the notes evidencing the indebtedness. The hotel was completed in 1929 and began operations.

Owing to economic conditions accompanying the depression in the early years of the hotel's operation, the hotel company became financially embarrassed and was unable to meet its maturing obligations, with the result that it was placed in receivership and foreclosure judgments sought in the district court on mortgages covering the property in amounts totaling approximately $400,000. The hotel company had defaulted in payments of ground rentals under its 99-year lease until these delinquent rentals amounted to $30,000 and there were numerous small claims totaling in excess of $2,000 which were unsecured. The owners of the ground under the hotel building had

joined in the execution of the mortgages which were in process of foreclosure in the district court so that both the landowners and the hotel company were about to lose their respective total investments.

By the joint efforts of plaintiffs and defendants, a loan of $200,000 was secured from the R. F. C. Mortgage Company after lengthy negotiations, and this, together with funds accumulated in the hands of the receiver, enabled the parties to liquidate all of these items of indebtedness against the hotel property except a small balance of approximately $165 which was paid from private funds of one of the parties. In procuring this loan from the R. F. C. Mortgage Company, it became necessary to modify the 99-year lease as to some of its terms and conditions, and after a new 99-year lease was agreed upon and made satisfactory to the R. F. C. Mortgage Company, the original 99-year lease was canceled of record and the new lease executed on the 12th day of August, 1936. It is the option to purchase clause in this later lease which is the basis of plaintiffs' action while defendants contend that the option to purchase clause in this new lease was not voluntarily agreed to by them but was induced and procured through the fraud and false representations of the plaintiffs as to certain requirements of the R. F. C. Mortgage Company in the modification of the old lease, which fraud and false representations were not discovered or known to defendants until after the commencement of the present action. There are two grounds of fraud and false representation alleged by defendants as follows:

"First, that the rescission of the original 99-year lease and the execution of the new 99-year lease had been procured by the fraud of the plaintiffs, acting by and through their agents; and

"Second, in the alternative that if the evidence be insufficient to establish actual fraud, that the plaintiffs in procuring the second 99-year lease had been guilty of inequitable, unjust and overreaching conduct toward the defendants and had taken advantage of the duress imposed by the economic situation created by the depression to drive a harsh and inequitable bargain with these defendants."

Defendants also asked by cross-petition for the cancellation of the 99-year lease here involved and the reinstatement of the 99-year lease executed in 1928.

Plaintiffs by their reply deny generally all of the alternative allegations of the answer and cross-petition.

At the opening of the trial defendants requested of the court that they be permitted to assume the burden of proof and to open and close the case. This request was granted by the court and the trial proceeded. Judgment of the trial court was for plaintiffs decreeing specific performance of the purchase agreement contained in the new lease and denying any relief to defendants under their cross-petition.

For reversal of the judgment defendants present their argument under two propositions thus stated in their brief:

"(1) The trial court erred in refusing to enter judgment for the defendants on their cross-petition, cancelling the new 99-year lease and reinstating the original 99-year lease.

"(2) The trial court erred in decreeing specific performance in favor of the plaintiffs and against the defendants."

Under these propositions the sole contention of defendants is that they were induced to execute the new 99-year lease by the fraud and false representations of the plaintiffs acting through their president and agent C. W. Bliss. The alleged fraud and false representations are said to have been committed and made by Mr. Bliss in reference to four requirements asserted by Bliss to have been made by the R. F. C. Mortgage Company as conditions to the closing of the loan of $200,000 finally granted to the plaintiffs. It is contended that there were false representations fraudulently made to the effect that a new ground lease for 99 years be executed

containing other and different conditions than those in the original lease; that it was falsely and fraudulently represented that the R. F. C. Mortgage Company required the cancellation of the delinquent ground rentals accrued under the original 99-year lease in the sum of $34,000; that it was also falsely and fraudulently represented that the new lease to be executed must contain a provision fixing the annual ground rental at $4,200; that it was also falsely and fraudulently represented that the new lease should contain an option to purchase clause to be exercised within a 15-year period for the price of $65,000 instead of the price fixed in the original lease. It is alleged by defendants and their argument proceeds upon the theory that these fraudulent representations alleged to have been made by plaintiffs were believed by defendants to be true and were absolutely relied upon by them in the execution of the new 99-year lease which contained these various provisions.

During the year or more consumed in the negotiations and perfecting of requirements for the $200,000 loan, Mr. J. P. Norton actively aided and assisted Mr. Bliss in his negotiations and Mr. Charles L. Yancy, an attorney, did much of the legal work required. Both Mr. Norton and Mr. Yancy were deceased at the time of this trial so that the only witnesses testifying, who had knowledge of the facts and of the transactions between the parties, were C. W. Bliss and A. J. Hamel. Their testimony on all material matters is in direct conflict and it devolved upon the trial court to weigh the testimony, aided therein by the facts and circumstances disclosed by documentary evidence produced, and to determine therefrom the relative rights of the parties under principles of equity.

As before stated defendants assumed the burden of proof and, in support of their allegations of fraud and false representations, introduced the testimony of A. J. Hamel. This witness testified in much detail to conversations between himself and Mr. Bliss and Mr. Norton

and denied expressly that Mr. Yancy was his attorney or represented him in the transactions here involved. He did testify, however, that he and Mr. Yancy had been close personal friends and business associates during a period of 15 years and that Mr. Yancy did a great deal of the legal work in meeting the title requirements of the attorneys for the R. F. C. Mortgage Company. C. L. Waite, co-owner with A. J. Hamel of the ground under the Bliss Hotel, lived in California. In February, 1934, defendant A. J. Hamel wrote a letter to Mr. Bliss in reference to the condition of the Bliss Hotel Company and the Toronto Investment Company and in reference to a statement of their financial condition furnished to defendant by Mr. Bliss, copies of which defendant had sent to Mr. Waite, used this language:

"Mr. Waite in turn took this matter up with Mr. C. L. Yancy, who represents both of us, and I enclose herewith copy of a letter I received from Mr. Yancy under date of February 6th. Will ask that you please let us have this information as soon as you can, or get in touch with either me or Mr. Yancy in reference to same."

In his testimony Mr. Hamel names no other attorney as having represented him in the transactions here involved and it may be reasonably inferred that he would not be a party to important business transactions involving his personal investment of large sums without the advice and assistance of a competent attorney. This statement in his letter to Mr. Bliss is consistent with the statement of Mr. Yancy in a letter written by him to Mr. Norton in December, 1935, in which he said:

"Messrs. Hamel and Waite have instructed me to advise you that they would not be interested in taking preferred stock in a company newly organized for the purpose of holding the title to and operating the Bliss Hotel."

A few days later Mr. Yancy again wrote to Mr. Norton in reference to the transactions between Hamel and Waite

on the one side and Bliss and Norton on the other and in the closing paragraph used this language:

"As I advised you in my letter of December 2nd, 1935, to you, the new lease must be in a form substantially the same as the one which you now have with the exceptions noted in my letters of December 2nd and of this date and must meet with the approval of the writer, who will draw the lease. My clients will of course expect the lessee to pay their attorney fee in connection with the preparation and execution of the necessary papers, as well as examination of the abstract."

On October 6, 1936, Mr. Hamel wrote to the agent of the Reconstruction Finance Corporation at Oklahoma City, enclosing the release and cancellation of the original lease, and in that letter said:

"Mr. Yancy does not want to file same for fear that there might be some hitch in the final closing of this loan and we would not want to release this original instrument."

We think that the weight of the evidence on this point establishes the relationship of attorney and client between Mr. Yancy and Mr. Hamel in these transactions, notwithstanding the lessees were required to pay the attorney's fee. The letters written by said attorney are corroborative of Bliss's testimony that he made no representations to Mr. Hamel as to the R. F. C. requirements.

It should be noted here that C. L. Waite, who represented the ownership of 37½ per cent of the ground under this hotel and who lived in California, came to Tulsa in the summer of 1935 and actively participated in the negotiations then being carried on in reference to refinancing the Bliss Hotel property. He and Mr. Hamel had frequent conversations with Mr. Bliss and Mr. Norton and it appears from the record that the organization of a new company to take over the hotel property was under consideration by the parties but was evidently abandoned

as indicated by the letter of Mr. Yancy to Mr. Norton on December 2, 1935, heretofore referred to. As a result of these prolonged conferences between the interested parties, Hamel and Waite evidently outlined to their attorney, Mr. Yancy, the basis on which they would participate in a plan for refinancing through the R. F. C. Mortgage Company, because in that letter, which was written before any negotiations were begun with the R. F. C., Mr. Yancy specifically outlined the concessions which Messrs. Hamel and Waite were willing to make toward the procurement of a loan. He stated that his clients were agreeable to releasing the delinquent ground rentals accrued under the 1928 lease; that they were agreeable to the execution of a new 99-year lease on substantially the same terms as the old one except that they would agree to a reduction in the rentals to be paid under the new lease; that the option clause in the new lease might provide a purchase price of $65,-000 if exercised within 15 years; that these concessions were conditioned that the hotel property should be encumbered with but one mortgage not exceeding $200,000 and at a rate of interest not exceeding 5 per cent; that they would join in the execution of such a mortgage but would not sign the notes evidencing the indebtedness. The concluding paragraph of this letter reads:

"It is the opinion of my clients that a good hotel operator can take this property and with a mortgage not to exceed $200,000.00, and with a ground rental cut to the amount this has been, that the first mortgage indebtedness can be rapidly paid, and a sufficient surplus accumulated during the fifteen year period to purchase the property, and they are fully conscious of the fact that Mr. Bliss is entirely capable of handling this property along the lines herein indicated."

It is clear that all of the parties realized that if the plan of refinancing the Bliss Hotel property was not accomplished they would lose their total investments therein. The ground own-

ers had an investment of $127,000, while Mr. Bliss and his mother had an investment of $150,000. The indebtedness which had to be financed through the proposed loan and the funds accumulated in the hands of the receiver through the operation of the hotel far exceeded these anticipated assets. Even after compromises had been worked out with the holders of the first and second mortgages and with unsecured creditors, the expected assets with which to retire the indebtedness would still be about $165 short. During the operation of the hotel prior to 1934, Mr. Bliss had advanced from his personal funds to the hotel company for operating expenses the sum of $95,000 while the deliquent ground rentals amounted to $34,000. It is evident that both parties realized that these personal claims of theirs could not continue to exist if the refinancing of the hotel was to be accomplished. With this mutual knowledge of the situation and its necessities, we think the defendants failed to establish by the weight of the evidence that fraud and false representations by Bliss and Norton induced their relinquishment of the delinquent ground rentals, but that such relinquishment was made by them with knowledge that only by so doing could any part of their capital investment be preserved to them. This, likewise, must have been the motive of Mr. Bliss in releasing the $95,000 indebtedness due to him.

Defendant's next contention of fraud and false representation relates to the $4,200 annual rental provided for in the 99-year lease. Defendant's testimony is to the effect that this was represented to him by Mr. Bliss as being a condition required by the R. F. C. as prerequisite to the granting of the loan. This testimony by Mr. Hamel is expressly denied by Mr. Bliss so that the letter of December 2, 1935, written by Mr. Yancy and heretofore referred to, becomes important because it is there stated that his clients would accept a reduced rental under the new lease graduated from $3,000 until it reached an annual rental of $4,200 and this communication of defendant's willingness to accept such delayed rentals was long prior to the final execution of the 99-year lease and the consummation of the R. F. C. Mortgage Company loan.

Defendants' next contention of fraud perpetrated upon them relates to the option to purchase clause contained in the new 99-year lease and, like the contention as to the relinquishment of the delinquent ground rentals, this false representation is testified to positively by Mr. Hamel and denied just as positively by Mr. Bliss. It is to be observed, however, that this identical purchase price was named in the letter of Mr. Yancy of December 2, 1935, as being agreeable to his clients Hamel and Waite. This was long before the lease was executed and long before it was definitely known that a loan sufficient to refinance the hotel property could be obtained. Since Mr. Yancy was the attorney for the ground owners and himself prepared the 99-year lease in accordance with the directions of his clients, it is apparent that the weight of the evidence on this point is not with the defendants.

C. L. Waite is not a party to this lawsuit nor did he testify as a witness in the case either personally or by deposition. Whether he had recognized the validity of the option to purchase clause in the new 99-year lease and had accepted payment for his 37½ per cent ownership of the ground is not disclosed by the record.

In the case of Andrews et al. v. English, 200 Okla. 667, 199 P. 2d 202, the fourth paragraph of the syllabus reads:

"In an action of equitable cognizance, the presumption is in favor of the findings of the trial court, and it will not be set aside unless clearly against the weight of the evidence. Where the finding of the trial court is general, such finding is a finding of each special thing necessary to sustain the general finding."

The judgment of the trial court is not clearly against the weight of all the facts and circumstances disclosed by the record.

Judgment affirmed.

CORN, LUTTRELL, HALLEY, and JOHNSON, JJ., concur. O'NEAL, J., dissents.