Ellis TAYLOR, Plaintiff in Error,

v.

Gene TAYLOR, Defendant in Error.

No. 40052.

Supreme Court of Oklahoma.

Dec. 17, 1963.

Rehearing Denied Feb. 25, 1964.

G. C. Spillers, G. C. Spillers, Jr., Jack R. Givens, Tulsa, for plaintiff in error.

R. R. Linker, Tulsa, and Smith & Inglish, Okmulgee, for defendant in error.

BERRY, Justice.

This is an appeal upon the original record from a judgment rendered in the Superior Court of Okmulgee County, in an action brought by plaintiff in error, hereinafter referred to as "plaintiff", seeking rescission and cancellation of a written agreement for payment of money. The factual situation, disclosed by extensive pleadings and a voluminous trial record, from which arose the issues herein to be considered, are summarized hereafter.

Ben Hur Coal Company, hereinafter denominated "Ben Hur", had been a wholly family-owned, domestic corporation since 1936, when owned and operated by the parties' father. Upon the father's death in 1945, the mother became sole owner by inheritance, other than individual shares given these parties and the Secretary-Treasurer of the corporation. At this time plaintiff became President of the company and continued in such capacity, except for a brief interval during which defendant served, until Ben Hur was sold in June, 1960. September 15, 1953, the mother gave plaintiff 129 shares of stock. Contemporaneously the defendant surrendered his share, and was not again a stockholder until March 10, 1959, when the mother assigned defendant 118 shares of stock.

Early in 1960, Ben Hur was in straitened financial circumstances by reason of generally poor conditions in the coal industry. The financial position in March, 1960, reflected a deficit net worth of $225,000.00. Principal liabilities, consisting of loans secured over prior years for operational expenses, amounted to $307,000.00 payable: $95,000.00 to Small Business Administration; $35,000.00 to a Tulsa, Oklahoma, bank; $19,000.00 to the parties' mother; $5,000.00 to defendant; and $153,000.00 to plaintiff. The S.B.A. obligation had been endorsed by the parties, but plaintiff was individual guarantor of the bank loan. The company was insolvent and entirely without further borrowing power. At the time, plaintiff had substantial personal assets, while the record discloses defendant had few financial resources.

As President and Vice President, both parties were interested and actively engaged in continuing efforts to consummate some substantial transaction which would resolve Ben Hur's financial condition. Defendant's efforts involved an attempt to secure a steel coal contract, under which Ben Hur's output of high-grade coal could be utilized. During this same time, plaintiff was engaged in negotiations looking toward outright sale of Ben Hur to Peabody Coal Company. These negotiations culminated in execution of a contract with Peabody in March, 1960. This agreement provided plaintiff was to deliver all Ben Hur stock to Peabody on or before June 7, 1960, in return for which Peabody was to assume and discharge all of Ben Hur's obligations, amounting to $375,000.00. However, Ben Hur retained the right to effectuate a better deal elsewhere if possible. Following execution of this agreement plaintiff returned home and discussed the matter with defendant and their mother, and a tentative agreement was to accept this offer unless something more advantageous could be secured.

Thereafter it was ascertained that technical problems precluded further consideration of Ben Hur coal as the basis for a steel coal contract. And, since Peabody had full knowledge of all circumstances relative to Ben Hur's affairs, it was apparent that Peabody undoubtedly would decline to consummate the agreement unless plaintiff was able to deliver the Ben Hur stock by the agreed deadline. With knowledge of these circumstances, defendant attempted to subject Ben Hur coal to a further technical process, by which it would be made suitable for use as steel coal. The attempted utilization was ineffective and the prospective purchaser declined to accept Ben Hur coal for use. The defendant then returned from Texas, and on May 19, 1960, entered a hospital in Okmulgee for treatment and to recuperate from an extended use of alcohol.

Defendant left the hospital and returned home on May 21, 1960, although the evidence is severely conflicting as to the time and manner of leaving and his physical and mental condition at and following his return home.

At a meeting in the mother's home on this date the parties executed an "Option to Purchase Stock", whereby the Ben Hur stock was to be delivered to plaintiff, with the provision that should the Peabody transaction not be concluded, the stock and consideration paid therefor would be returned. Plaintiff's checks upon Ben Beau Coal Sales, his individually-owned business, were issued in payment. One such check in the amount of $118.00 was payable to defendant as payment for his 118 shares of Ben Hur stock. This check was endorsed and deposited by defendant the following Monday. However, although defendant promised to deliver the stock certificate to plaintiff, this was not done, although plaintiff made demand for delivery.

On May 25, 1960, both parties were together in plaintiff's office and at that time defendant demanded payment of $50,000.00 from the Peabody transaction, and indicated if not paid he would refuse to deliver his stock certificate and thereby preclude the Peabody contract from being concluded. The discussion ended inconclusively and plaintiff thereupon sought legal advice. In

reply to plaintiff's written demand, the defendant, by letter dated May 28, 1960, advised plaintiff that he was entitled to $50,000.00 as reasonable payment for his efforts to develop a coal-processing method which would have made Ben Hur coal suitable for steel-mill use since the Peabody contract had been secured during such experiments and as a result of which value of Ben Hur stock was greatly enhanced.

The final date for consummation of the Peabody contract was June 7, 1960. On June 4th, defendant again wrote plaintiff, tendering back the $118.00 theretofore received as payment for his stock and declaring that acceptance of the check and execution of the instruments transferring the Ben Hur stock had occurred when defendant was suffering the after-effects of alcoholism and sedation administered in treatment therefor, as a result of which defendant was incapable of exercising sound judgment. Thereafter, further negotiations took place between the parties, and the matter also was discussed between different counsel representing the parties. On June 6, 1960, plaintiff, through attorney, advised defendant his demand would be met, and both parties met with their attorneys in Tulsa and executed the following agreement (omitting formal portions):

"In consideration of your delivery to me of the stock certificate now standing in your name for 118 shares of common stock of Ben Hur Coal Company, the same being all of your stock ownership in said corporation, in order that I may consummate the existing deal with Peabody Coal Company, the terms of which deal are well known to each of us, I agree to pay you the sum of Fifty Thousand ($50,000.00) Dollars immediately upon receipt by me of my existing claim in full against Ben Hur Coal Company as presently reflected by the books of the said corporation, which indebtedness is in the approximate sum of $150,000.00.

"Provided, however, that should any contention arise by reason of which it is asserted that Ben Hur Coal Company is not legally indebted to be in the sum presently shown to be owing to me on the books of the corporation, then and in that event I agree not to settle my existing claim for less than its full value without your consent.

"Provided, further, that in the event that for any reason beyond my control or without any fault on my part I shall ultimately fail to receive payment of the total amount of indebtedness due to me by Ben Hur Coal Company as presently reflected by its books, then and in that event I shall pay to you one-third (1/3) of the amount which I shall actually receive.

"Provided further, that in the event the deal which I now have with Peabody Coal Company should for any reason without my fault or for reasons beyond my control be not consummated, then the terms of this instrument shall be null and void, and the said stock shall be returned by me to Gene Taylor."

Pursuant to this agreement, defendant delivered his stock to plaintiff, who then completed sale of Ben Hur to Peabody and received the $150,000.00 in settlement. However, plaintiff thereafter declined to settle with defendant under the terms of the agreement, and on October 29, 1960, written demand was made upon plaintiff to comply therewith. The plaintiff thereupon brought suit seeking cancellation of the quoted agreement.

The petition alleged facts concerning stock ownership, the corporate indebtedness, plaintiff's execution of the agreement with Peabody upon his personal responsibility, purchase of defendant's stock on May 21, 1960, and defendant's refusal to surrender his stock unless plaintiff agreed to payment as demanded, and execution of the above agreement. Plaintiff alleged such agreement was executed by reason of duress, menace, fraud and undue influence imposed upon him by defendant, in that defendant knew the Peabody deal would fail unless plaintiff could deliver all Ben Hur stock,

and by refusing to deliver the stock unless plaintiff agreed to defendant's demand, plaintiff was forced to submit to defendant's demands. The prayer was for cancellation of the agreement, and judgment releasing plaintiff from obligation thereunder.

Defendant answered by general denial, and further specially denied plaintiff had grounds for rescission, having failed to restore the stock certificate to defendant; that plaintiff could not rescind the agreement and retain the certificate; that a good-faith controversy had existed between the parties as to Ben Hur's purported indebtedness to plaintiff, particularly in view of plaintiff's having engaged in outside business in competition with Ben Hur and which had contributed to the corporation's financial difficulties; the sale of stock and defendant's claims had been compromised by the settlement agreement, and any fraud or duress involved had resulted from plaintiff's failure to comply with this agreement; that plaintiff purchased defendant's stock or that any valid agreement had been entered into May 21, 1960; that had any agreement been made on that date, plaintiff waived and abandoned same by reason of the agreement of June 6, 1960.

By cross-petition defendant alleged the agreement of June 6, 1960 was executed by reason of plaintiff's need to acquire the entire stock and consummate the Peabody transaction; that defendant had complied with the agreement, but despite having been paid by Peabody plaintiff refused to pay defendant, who, therefore, was entitled to judgment according to the agreement.

By way of reply plaintiff denied having conducted a competing business to the corporation's detriment, or that the stock purchase of May 21, 1960, was waived, abandoned or rescinded by the subsequent agreement, which was invalid and void. Denial of the allegations of the cross-petition was to the effect that no bona fide agreement had existed upon which compromise could be based; no competing business had been conducted, but if same should be found to have existed, this was with knowledge of stockholders and had been acquiesced in by other stockholders; bulk of complaints in this regard was barred by laches or limitations, and in part had occurred during period when defendant was not a stockholder and therefore without legal right to complain.

The issues formed by the pleadings were tried to the court. At the close of the evidence the trial court made a general finding in favor of defendant upon plaintiff's petition, and for defendant upon the cross-petition.

The evidence, together with a multitude of exhibits, combine to present a voluminous record on appeal. As grounds for reversal of the judgment plaintiff advances two propositions: (1) error in holding the contract sought to be cancelled was supported by consideration; (2) error in holding the contract was not invalidated by duress and undue influence. Both numbered propositions are subdivided into topical headings, whereunder the supporting argument is predicated upon the assorted sufficiency, or insufficiency as the case may be, of the evidence to establish the particular headings of argument. The basic argument simply is that because the judgment was entered upon a general finding for defendant, such conclusion necessarily included a finding that: defendant was legally incompetent to execute the stock option contract on May 21, 1960, because under the influence of alcohol and sedatives; (b) he was incapable of ratifying such transaction on May 23, 1960, when he received and deposited plaintiff's check; (c) the letter agreement of June 6th represented a compromise settlement free of fraud, duress and undue influence; plaintiff was guilty of a breach of trust while serving as President of Ben Hur.

Plaintiff then asserts all of such findings are contrary to the weight of the evidence, are unsupported thereby and are contrary to law and require reversal of the judgment.

Plaintiff first contends the trial court erred in holding the contract sought to be cancelled was supported by consideration. The argument is that if plaintiff purchased

defendant's 118 shares of stock on May 21, 1960, the subsequent agreement requiring plaintiff to pay defendant for delivering the stock was wholly without consideration. Plaintiff cites the statute, general text law, and decisions from this Court to the effect that performance, or promise to perform a duty imposed by law, or which the promisor already legally is bound to perform, is not sufficient consideration to support a contract. 15 O.S.1961 § 106; 17 C.J.S. Contracts §§ 110–112; Trailmobile, Inc. v. Yoder, (Okl.) 292 P.2d 163; Mid-Continent Pet. Corp. v. Wilhoit (Okl.), 270 P.2d 645. Then, upon this premise plaintiff asserts the evidence overwhelmingly establishes plaintiff's purchase of defendant's stock, and that defendant was fully aware of what was transpiring at the time of execution of the option contract of May 21, 1960.

Plaintiff then reviews a considerable portion of the testimony relative to defendant's execution of that instrument, and an extended amount of the testimony concerned with the possibility and possible extent of defendant's disability and lack of capacity on that day (May 21st), resulting from alcoholic indulgence and medical treatment therefor. And, we are afforded an ancillary argument with supporting authority, concerning degrees of intoxication required by law to be shown in order to invalidate a contract.

■■ It is acknowledged the evidence bearing upon the matters noted above is conflicting and susceptible of contrary interpretation. The extent of such evidence precludes recitation, discussion and reconcilement. In an equitable proceeding this Court will examine the entire record and weigh the evidence. This has been done carefully and at length. In such a case this Court will not disturb the trial court's judgment unless clearly against the weight of the evidence. We decline to set aside the judgment rendered herein as clearly against the weight of the evidence upon the above-mentioned matters. Estes v. Tompkins (Okl.), 371 P.2d 86.

The pivotal question is whether any consideration supported the compromise agreement of June 6th, or whether same was void for lack thereof by reason of being only an agreement to do that which defendant already was bound to perform.

■ Plaintiff's position is that he had purchased and paid for defendant's stock under the option contract executed May 21, 1960, thus the subsequent agreement of June 6th under which defendant was to "deliver" the stock for an additional consideration was without consideration, since defendant only agreed to do something which he already was bound to do. As an abstract principle plaintiff's argument and the authorities cited in support thereof present a correct statement of the law. However, for this principle to be decisive of the matter it would have been necessary for the trial court to have found that the stock-option agreement executed May 21, 1960, was final and binding in all respects without recourse to, or consideration of, matters surrounding both that transaction and other matters of apparent difference between the parties.

■ The evidence, although conflicting upon this feature of the case, discloses the parties were not in agreement on various phases of the corporate affairs and other related matters. No purpose would be served by recitation of the testimony. There was evidence of a controversy as to whether the stock-option agreement created a legal obligation for defendant to deliver his stock, or whether circumstances surrounding the transaction were invalid in view of defendant's physical and mental condition. The evidence revealed that a serious effort was made to adjust the parties' differences, but nothing resulted from such conferences. And, there was other evidence which conclusively established that firm offers of substantial cash payments were made to defendant, and refused by him, before his full demand was met and the final settlement agreed upon. And, the evidence bearing upon the final conference, drafting of the instrument and execution thereof lend support to the conclusion that this was a compromise, freely entered into by the parties as the best possible solution of their diffi-

culties. The evidence, and the surrounding circumstances amply support the trial court's finding that there was legitimate controversy between the parties which was compromised and settled by execution of the agreement in question.

In 15 C.J.S. Compromise and Settlement § 2, the text states:

"Conflicting claims are essential to the validity of a compromise, one of its essential elements being the existence of a bona fide dispute or controversy between the parties, although it is immaterial what may be the real legal merits of the claim on either side. * * *"

This principle has been recognized and applied by this Court. Fenner v. Sparks, 170 Okl. 556, 39 P.2d 27; Rice v. Young, 200 Okl. 416, 194 P.2d 882; Dean, etc. v. Jelsma (Okl.), 316 P.2d 599. The syllabus in Rice v. Young, supra, states:

"A doubtful or disputed claim, honestly and in good faith asserted, arising from a state of facts upon which a cause of action can be predicated and concerning which an honest controversy may arise, is sufficient to constitute a good consideration for a contract of compromise and settlement although it may subsequently develop that such claim was unfounded."

The general judgment rendered by the trial court necessarily included the finding that a controversy existed between the parties, and was compromised and settled by the agreement of June 6, 1960. The trial court was correct in so finding.

Plaintiff's second contention is that the trial court erred in holding the compromise agreement of June 6, 1960, was not invalidated by reason of duress and undue influence.

It is urged that plaintiff executed the agreement as the result of duress and undue influence within the meaning of our statutes defining such acts (15 O.S. 1961 §§ 52–56). The argument in behalf of this proposition is made under four topical headings, and includes seven numerical subheadings. Under each topic plaintiff reviews at length the evidence relating to the particular phase of the transaction, and collateral matters touching upon the entire history of the parties' business affairs. Although commending the manner of presentation, we are unable to accept the arguments as decisive. Particularly since it is observed that the conclusion reached under each portion of the argument is premised upon plaintiff's interpretation of the meaning and weight of the evidence in respect thereto.

In the trial court plaintiff urged that execution of the contract resulted from duress and undue influence. On appeal it is contended that under our statutes, supra, plaintiff's consent to the agreement was not a real, or free, consent, since defendant was guilty of duress in unlawfully withholding the stock certificate which belonged to plaintiff; and, that undue influence resulted from defendant's taking oppressive and unfair advantage of plaintiff's necessities. Text and case authorities are cited to the effect that threats of injury to property, or business compulsion inducing a contract, may invalidate the agreement. And, as announced in Newsom v. Medis, 205 Okl. 574, 239 P.2d 784, duress is determinable not only from the nature of the acts or threats, but also by the state of mind of the victim induced thereby.

The evidence discloses that plaintiff had knowledge of all matters concerning defendant's claim prior to execution of the agreement, and executed same upon advice of counsel. And, prior to final settlement, plaintiff negotiated with defendant in an effort to accomplish a compromise upon more advantageous terms. In many instances we have held that motive, power, or opportunity to exercise undue influence alone are insufficient to establish that such influence in fact has been exercised. Sporn v. Herndon, 190 Okl. 149, 121 P.2d 602, 605. The general finding entered by the trial court was a finding of every special thing necessary to sustain this general finding. Hamel v. Toronto Inv. Co., 202 Okl. 553,

216 P.2d 319. The trial court therefore found that the agreement in question did not result from duress or undue influence practiced by defendant. We are of the opinion the trial court's finding was not against the clear weight of the evidence.

The judgment of the trial court is affirmed.

WELCH, DAVISON, JOHNSON, WILLIAMS, JACKSON and IRWIN, JJ., concur.