**TRENT et al.   v.   TRENT et al.**
No. 35999.

Supreme Court of Oklahoma
April 27, 1954.

Rehearing Denied May 25, 1954.

P. D. Erwin, Chandler, J. T. Criswell, Prague, for plaintiffs in error.

Dale B. Sutton, Chandler, Kelsey Hutchinson, Philip R. Wimbish, Tulsa, for defendants in error.

ARNOLD, Justice.

Plaintiffs, all of whom were children of Charles G. and Mary Trent, both deceased, brought this action in the District Court of Lincoln County against P. J. Trent, a son of the deceased and brother of all the plaintiffs, and his wife Charlotte, and The Texas Company, alleging in their first cause of action that during his lifetime Charles G. Trent, their deceased father, was the owner and in possession of a certain described 40-acre tract in Lincoln County; that on November 16, 1945, Charles G. Trent and his wife Mary for the consideration of $1,000 made, executed and delivered to defendants P. J. Trent and his wife a warranty deed on said premises which deed specifically reserved unto the grantors one-half of all oil, gas and other minerals; that said deed was duly recorded on January 24, 1946; that thereafter on August 30, 1948, defendants unlawfully and fraudulently filed for record a purported mineral deed dated November 16, 1945, from Charles G. and Mary E. Trent to defendants conveying an undivided one-half of all the minerals under said property; that said mineral deed was never made, signed, acknowledged or delivered by the grantors and they had no notice that same had been filed for record; that Charles G. Trent died intestate on January 19, 1950, and Mary E. Trent died intestate on March 12, 1951; that plaintiffs are children and heirs of said deceased and each is the owner of a 1/10th part of said one-half of all the minerals in and under the said real property; that The Texas Company is the owner of a lease on said premises dated August 1, 1951, and has completed a producing oil well on the premises and should be required to account for one-half the sales of oil and gas produced from said premises; for their second and alternative cause of action plaintiffs alleged that if Charles G. and Mary E. Trent ever signed the mineral deed in question such signature was obtained without consideration and by fraudulent misrepresentation and undue influence upon said grantors; that defendants represented that they would take and hold said mineral interest in trust for all the children; that after said deed was filed and recorded Charles G. and Mary E. Trent joined in the execution of a lease on said premises and received one-half the bonus and rentals therefrom; that said deed should be cancelled and defendants be adjudged to hold the legal title thereon in trust for plaintiffs. Copies of the warranty deed and of the mineral deed in question were attached as exhibits to the petition. By amendment plaintiffs alleged they had no knowledge of these facts until less than two years prior to filing the petition.

Defendants P. J. and Charlotte Trent filed a general denial and alleged that both of said deeds were made, executed and delivered for a valuable consideration and no oral or written promise or agreement was made in connection therewith. Defendant The Texas Company answered by general denial and that it had witheld the proceeds from one-half the royalty on said tract, that it was a bona fide purchaser for value of the lease, and that it was a mere stakeholder.

Plaintiffs' evidence reasonably tends to show that at the time of his death in January, 1950, Charles G. Trent was 84 years old and his wife, Mary E. Trent, at the time of her death in 1951 was 78; that for a good many years prior to their deaths they had not lived on the 40 acres here involved but had lived in the town of Chandler; that Charles G. Trent had vision in only one eye and usually in handling his business had other people write his checks for him to sign; that soon after the date of the execution of the deeds in question Rufus Trent, one of the plaintiffs, talked to his brother P. J. Trent, defendant here, at his place of business in Prague at which time P. J. Trent told him he had bought the surface of the 40 acres (which was a part of the old family homestead) and one-half the minerals from his parents for $1,000; that he did not think much of it as an investment but the old folks needed some money to make an addition to their house; that the old folks took the $1,000 and added a bathroom and another room to their house in Chandler; that both Charles and Mary Trent seemed to have equal confidence in all of their ten children and treated them all alike; that until after

their father died the other children did not know that P. J. Trent had recorded a mineral deed to the remaining 20 acres of mineral under the forty; that P. J. told several other of the children that he had bought only the surface and half the minerals under the forty; that after the father's death the mother, Mary Trent, told P. J. Trent in the presence of some of the other children that the balance of the twenty acres of minerals in his name did not belong to him but belonged to all the heirs; that at that time Mary Trent's memory was good some days and bad other days; that after the date of the deed in question Charles and Mary Trent joined with P. J. Trent in executing an oil and gas lease to Quentin Little on the 40 acres and received half the lease bonus and half the rentals during the life of the lease; that no development was had under this lease and it was thereafter released of record; that after the death of both parents, in August 1951, P. J. Trent and his wife executed a lease to The Texas Company and The Texas Company had brought in one producing well on the property and had two others drilling; that one of the neighbors tried to buy some of the minerals from Charles Trent on this forty acres (the time not being fixed, whether before or after the deeds to P. J. Trent) and he refused saying he wanted to reserve it for his children; that in about 1948 he told some of the other neighbors that he still had twenty acres of royalty under a forty acres but did not say what forty; that after the father died P. J. Trent showed the originals of both the deed to the surface and half the minerals and the mineral deed to the other twenty acres of minerals to one of the children; several of the children testified that after the date of the deed in question both the mother and father had told them that they still owned 20 acres of minerals under the forty and they intended that it would be left for the benefit of all the children after the death of the parents; photostatic copies of the originals of the two deeds were offered in evidence for the purpose of comparison of the signatures on the two deeds.

Testimony was offered by plaintiff to show that on a number of occasions after the date of the execution of the deeds but prior to the recording of the mineral deed here in question Charles G. Trent told some of his children out of the presence of defendants that he had sold P. J. the surface and a half interest in the mineral rights and had retained the other half of the mineral rights for the benefit of all the children, and that the mother, Mary E. Trent, made similar statements on like occasions. This character of testimony was objected to on the ground that it consisted of statements of the deceaseds made out of the presence of defendant and that the witness was incompetent to testify as to a conversation had with a deceased person because he acquired his interest from the dead persons and this objection was sustained by the court. This evidence was properly excluded because it was hearsay. Later, as shown above, testimony to this same effect was allowed to go in the record.

At the conclusion of plaintiffs' evidence defendants P. J. and Charlotte Trent and The Texas Company entered separate demurrers to the evidence. The court sustained the demurrer to the first cause of action on the ground that there was no evidence that the mineral deed in question had been forged and sustained the demurrer of The Texas Company to the extent that the court adjudged it a mere stakeholder and that it should stand by to account for the one-half of the royalty in dispute in the event plaintiffs should obtain judgment decreeing them to be the true owners thereof.

Defendants' evidence reasonably tends to show that both deeds were prepared at the same time by the abstracter-notary who acknowledged both deeds; that the deeds were prepared in that manner at the joint request of Charles and P. J. Trent; that both deeds were signed in the presence of the notary at the same time; that at the time of the preparation and signing of the deeds there was some discussion between the abstracter-notary, Charles and P. J. Trent as how best to handle the transaction so that P. J. Trent would have full title to the land but that Charles Trent and his wife would be entitled to one-half of any lease bonus, lease rentals, or royalty

payments during their lifetimes; that the abstracter-notary suggested it might be wise to see an attorney about the proper way to handle the matter and warned the parties about the dangers inherent in unrecorded deeds and deeds recorded after the death of a grantor; that it was finally agreed that the deeds be drawn in the way they were and the notary prepared them at the instruction of both Trents; that the notary could not remember whether the deeds were delivered to P. J. Trent at that time but would say it was natural for them to be so delivered; that the bank records showed that P. J. Trent paid his father $1,000 which was deposited to the father's account; that the deeds were delivered to P. J. Trent immediately after their execution; that the deed to the surface and one half the minerals was recorded within a month or so after its execution; that Charles and Mary Trent used the money obtained from the sale to P. J. and the lease bonus and rentals to repair their home; that a few weeks prior to the sale to P. J. Trent Charles Trent had tried to sell the land to one of the other children who refused to buy it; that the offer made was to sell the full fee simple title; that in the year 1945–1946 there was no oil activity in that vicinity; that there had been oil activity prior to those years but several dry holes drilled in the vicinity had killed the interest in developing further; that the fair cash value of this 40 acres at the time it was sold in 1945 was $20 per acre; that the land was not in cultivation, although it had been cultivated in the past, but was upland grazing land.

Defendant P. J. Trent took the stand and plaintiffs immediately objected to his competency as a witness to testify concerning any transaction or communication with the deceaseds, Charles G. or Mary E. Trent, or to any material fact in the case, which objection was overruled by the court; over repeated objections to the same effect, he testified that he deposited $1,000 in the bank to the credit of his father and identified his cancelled checks, which objections the court overruled on the ground that although they might indirectly affect the transaction the wit-

ness was merely identifying instruments about which the banker had already testified; that this sum was paid as consideration for this 40 acres of land; that he had never had a conversation with his mother in the presence of his other brothers and sisters, as testified by one of them, in which she told him he did not own the mineral interest covered by the mineral deed nor any of the conversations testified to by his brothers and sisters to the effect that he bought only the surface and one half the minerals; that one of his brothers had told defendant he had offered their father $500 for the fee simple title property and had refused to give the father any part of any lease bonus or rentals which offer the father refused; that defendant had shown several of his brothers both deeds here involved several times both before and after his father's death; that the deeds were delivered to defendant on or about November 19, 1945, and except for the time they were being recorded had been in his possession ever since; on cross-examination plaintiff's attorney asked defendant why he didn't record the mineral deed at the same time the other one was recorded, to which defendant answered that he and his father were undecided how to take care of letting his father have one-half the bonus and rentals during his lifetime and after talking it over with the notary they agreed to make two deeds which defendant would record when he saw fit and defendant would give his father one-half the bonus and rentals from the land as long as his father lived; that he kept this agreement fully, paying his father during his lifetime and his mother thereafter one-half the lease bonus and rentals.

Rebuttal testimony was offered on both sides which was merely cumulative of that outlined above.

At the conclusion of all the testimony the court found generally in favor of defendants and against plaintiffs on the second cause of action and entered judgment accordingly. From order overruling motion for new trial plaintiffs appeal.

Plaintiffs contend that the evidence is sufficient to show that P. J. Trent stood in a confidential relation to his parents,

that there was overreaching and trickery in obtaining the mineral deed, that the mineral deed is void because of lack of consideration, fraud, and undue influence. There is no testimony to this direct effect but plaintiffs claim that the transaction speaks for itself.

There was uncontradicted testimony that P. J. Trent paid more than the fair cash value of the fee simple title at the time of sale. In fact it is a reasonable inference that P. J. paid his parents more for the land than they could have obtained anywhere else or than he would have paid anyone else; that the other children knew of the transaction and made no objection thereto until more than five years later when a producing oil well was drilled on the land. The judgment of the court that there was no fraud, overreaching, or lack of consideration for the deed is not clearly against the weight of the evidence.

Nor is the evidence insufficient, as plaintiffs claim, to establish that the mineral deed was intended as an unconditional conveyance according to its terms. The testimony of the notary shows that it was the intention of the grantors to reserve unto themselves a life estate in one-half of the minerals and they chose this method of so doing. Nor does the evidence establish a trust in favor of plaintiffs. The weight of the evidence is otherwise.

Plaintiffs further contend that the court erred in sustaining the demurrer to the first cause of action, because the evidence is sufficient to show that the mineral deed was not knowingly executed by the parents; that there is evidence tending to show that the deceaseds claimed to own this mineral interest after the date of the deed in question; that deceaseds were old and did not understand business affairs.

There is direct testimony by a distinterested witness that the mineral deed was knowingly executed and delivered for a valuable consideration; that it was prepared at the direction of the deceased and in the manner directed by him, and that a valuable consideration was paid therefor. The fact that defendant and his father may have had a side agreement which defendant performed in no way affects the validity of the deed or the estate thereby conveyed.

Plaintiffs urge that defendant P. J. Trent was incompetent to testify, as he did over their objections, concerning the transaction which he had with the deceased. Reference to the foregoing statement of facts shows that all of the testimony by this defendant which is claimed to be incompetent was not incompetent. Defendant could identify written instruments though incompetent to testify actually to a transaction. Defendant did, however, testify to the details of the transaction with the deceaseds and as to what he and they said but this was brought out by plaintiff on cross-examination, was not amplified in any manner by defendant on re-direct examination, and was cumulative and harmless.

The judgment of the court is not clearly against the weight of the evidence.

Affirmed.