Mary DEAN, Joseph Dean, Thomas Dean, Patricia Catron, nee Dean, John Dean, and Mary Dean, Executrix of the Estate of Joseph Charles Dean, deceased, Plaintiffs in Error,

v.

Marie Katherine JELSMA, nee Dean, Defendant in Error.

No. 37466.

Supreme Court of Oklahoma.

June 25, 1957.

Rehearing Denied Sept. 10, 1957.

Charles D. Scales and Lee G. Gill, Oklahoma City, for plaintiffs in error, Mary Dean, individually and as executrix of Estate of Joseph Charles Dean, deceased.

John F. Eberle and Richard J. Spooner, Oklahoma City, for plaintiffs in error Joseph Dean, Thomas Dean, Patricia Catron, nee Dean, and John Dean.

Richard J. Spooner, Oklahoma City, for plaintiff in error Guardian ad litem of John Dean, a minor.

Charles Hill Johns, Oklahoma City, for defendant in error.

CORN, Vice Chief Justice.

Marie Katherine Jelsma, nee Dean, brought this action in the District Court of Oklahoma County against Mary Dean, individually and as executrix of the estate of Joseph Charles Dean, deceased, Thomas Dean, Joseph Dean, Patricia Catron, nee Dean, and John Dean to establish her equitable title in and to an undivided one-half interest in certain real and personal property, and the increase or conversion thereof, legal title to which was in said deceased, and to impress a trust thereon in the hands of said executrix, for delivery of proper conveyances thereof, and for an accounting. Judgment was rendered granting plaintiff the relief prayed for. From separate orders overruling motion for new trial, Mary Dean, individually and as executrix, and Thomas Dean, et al., appeal.

The uncontradicted evidence of plaintiff, together with reasonable inferences drawn therefrom, reasonably tends to show that plaintiff was the only child of the marriage of Joseph Charles Dean and Julia Finnegan Dean; that during their marriage Joseph Charles Dean and Julia Dean accumulated through their joint efforts a substantial amount of real and personal property; that some of said property was carried in the names of husband and wife jointly, and some real property in the name of the husband alone; that a part of said property was a bakery in Shawnee which was operated by the husband and wife together and also Marie Katherine; that in 1919 they sold the bakery for a substantial sum, part cash and the balance secured by a mortgage which was afterward paid; that a home was purchased in Oklahoma City, with the intent of moving there, but before such move was made Julia Dean, after a short illness, died; that so far as plaintiff knew no probate of her estate was had; that plaintiff and her father, after the death of Julia Dean, entered into an agreement, in the nature of a family settlement, whereby plaintiff's interest in and ownership of the property owned by her mother prior to her death, as well as the interest which plaintiff would have in the remainder of the property was agreed upon and fixed; on this point plaintiff testified that she obtained the ownership of a one-half interest in all of the property accumulated by the joint efforts of her mother and father through inheritance from her mother and by gift, "fifty-fifty"; that after her mother's death plaintiff and her father moved to the home in Oklahoma City and thereafter negotiated for and purchased a furniture store which they operated together, and plaintiff also assisted in looking after other rental property and mortgages; two disinterested witnesses testified to statements made by Joseph Charles Dean tending to show that he recognized and acknowledged that Marie Katherine owned an interest in the property standing in his name; that in 1922 Joseph Charles Dean desired to marry one Mary Kahanck; that he and Marie Katherine discussed the making of an antenuptial contract and will with an attorney, who drew an antenuptial contract and discussed its provisions with Marie Katherine and her father; that thereafter, on October 27, 1922, executed said antenuptial contract in Marie Katherine's presence and a copy thereof was give to Marie Katherine; that about a month after the marriage of Joseph Charles Dean and Mary Kahanek he executed a will, dated December 9, 1922, in conformity with the provisions of the antenuptial contract, in which he devised an undivided one-half interest in all his property to Marie Katherine and the other half to his new wife and incorporated in said will as a part and parcel thereof a copy of the antenuptial contract; a copy of this will was also given plaintiff; that plaintiff continued to work in the furniture store and assist her father in the management of said property after the marriage; that after the death of her father, on May 28, 1954, she learned for the first time that her father had executed a new will on May 3, 1938, in which he attempted to revoke all prior wills and rescind the antenuptial agreement, and by the terms

of which plaintiff was given $2,000 and all the remainder of the property standing in his name was left to Mary Dean, his widow, and the four children of his marriage with Mary Kahanek Dean, the defendants above named; that said will of May 3, 1938, was admitted to probate in the County Court of Oklahoma County as the last will and testament of said deceased on July 12, 1954; plaintiff instituted this action in District Court on July 26, 1954.

The antenuptial contract and will made in conformity therewith, above referred to, were introduced in evidence. The antenuptial contract provides that it shall be binding upon the parties thereto, their heirs, executors, administrators, and assigns, and, "upon any and all other persons whatsoever interested in same in any way"; it lists the property, real and personal, standing in the name of Joseph Charles Dean as of the date of the contract, of the total stated value of $48,960; it further provides that any consideration to or from Joseph Charles Dean shall be the same as consideration to or from Marie Katherine Dean, his dependent daughter, "who it is agreed may carry out, or require the carrying out, of the provisions of this contract, upon his behalf, in case of his consent, absence, inability, or death"; that all property standing in the name of Joseph Charles Dean at the time of marriage is to remain in his name during his lifetime and no division of same is to be made during his lifetime, he to remain in complete charge of same; that in case of divorce said property shall become as it was before the signing of the contract, and that property gained solely through the joint endeavor of husband and wife, over and above said $48,960, should be divided equally between husband and wife and Marie Katherine Dean, each receiving one-third, "and all such divisions or other such provisions herein shall be made and carried out by the said Joseph Charles Dean, if living, as by a trustee, and if he be dead then by the said Marie Katherine Dean"; that all property belonging to Mary Kahanek at the time of marriage shall remain hers alone forever; "that in case of

the death of the said Marie Katherine Dean *all interest of hers in the property hereinbefore set out in detail or that may accrue therefrom, or the value thereof,* will revert to the said Joseph Charles Dean"; that in the case of the death of Joseph Charles Dean, before divorce and without children, "all interest of his" in the property or accruals therefrom will revert to Marie Katherine and Mary Kahanek (Dean) equally; that in case of the death of Mary Kahanek all property of hers which she had before marriage should go to her heirs and all property acquired by her during marriage should revert to Joseph Charles Dean, if living, otherwise to Marie Katherine Dean, unless there were direct blood descendants of said husband and wife to whom it may go; "and in no way is the said property or any part thereof to be bequeathed away from the said Marie Katherine Dean or the said Joseph Charles Dean"; further provisions, not here material, are made pertaining to the contingency of divorce or separation, and life insurance policies.

As above stated, the will dated December 9, 1922, devised one-half of all property owned by deceased at his death to Marie Katherine Dean and the other half to Mary Dean, and attached a copy of said antenuptial contract to said will and incorporated said contract as a part and parcel thereof.

The evidence of defendants consisted of the introduction of the will of said deceased dated May 3, 1938, the certificate of probate and order admitting same to probate, and three deeds, one dated in 1911 showing that J. C. Dean was the grantee of certain property located in Shawnee, one dated in 1935 and one in 1940 showing that J. C. Dean and Mary Dean, husband and wife, were the grantees of two pieces of real property located in Oklahoma County.

Mary Dean, executrix, and her four children have filed separate petitions in error and separate briefs, urging separate and different assignments of error; both of said briefs set forth numerous and

lengthy propositions. Mary Dean, executrix, however, asserted in the court below and asserts here in her brief that she as executrix is the only necessary party in this action; that her four children, although they may be proper parties, are, and would be whether parties or not, bound by any judgment against Mary Dean as executrix of the estate of Joseph Charles Dean, deceased. Despite the contentions of the four children to the contrary, this is correct. 58 O.S.1951 § 252; Jameson v. Goodwin, 43 Okl. 154, 141 P. 767; Treese v. Spurrier Lumber Co., 115 Okl. 188, 242 P. 235; United States v. Sands, 10 Cir., 94 F.2d 156; Bailey v. Wood, 183 Okl. 450, 83 P.2d 180; Hopper v. Rowntree, Okl., 275 P.2d 285.

The executrix, as do the four children, first contend that the court erred in refusing to grant their request for a jury trial. This is an equitable action, triable to the court, and the court did not err in refusing a jury trial. Allen v. Jones, 188 Okl. 546, 110 P.2d 911.

All appealing parties protest the competency of plaintiff as a witness under 12 O.S.1951 § 384, the so-called "dead man" statute, and the introduction of plaintiff's deposition in evidence.

The record discloses that on September 23, 1955, after a general appearance had been entered on behalf of all defendants by their two attorneys, said attorneys took plaintiff's deposition, at which time they elicited from plaintiff, in response to questions propounded by them, answers concerning transactions with her deceased father. Thereafter in January, 1956, the four children hired separate counsel, who called the attention of the court to the fact that one of the children, John Dean, was still a minor and had a guardian ad litem appointed for him, and thereafter these attorneys filed various additional motions, demurrers and answers on behalf of all four children. Upon plaintiff being called as a witness, both the attorneys for the executrix and the attorneys for the four children objected to her competency. The deposition was introduced and the questions and answers read therefrom to show waiver by defendants of the "dead man" statute, and the court allowed it to be introduced for this purpose over the strenuous objections of defendants, but the court refused to allow plaintiff to go any further in testifying than the questions asked her by defendants in said deposition; after the questions and answers, one by one, had been read for this purpose, and plaintiff had testified that those were the questions asked her by defendants and that she had made those answers, plaintiff offered to testify that if the same questions were asked her at that time she would make the same answers, but the trial judge held that such evidence would be merely repetition, inasmuch as she had already gone over all of them on the witness stand, and allowed the deposition in evidence for all purposes.

The executrix contends that this action on the part of the trial judge was error because the witness was present in person to testify and therefore it was error to admit her deposition; as shown above, the trial judge decided that inasmuch as plaintiff had already testified that those questions were asked her and that she made those answers, that it would be merely repetition to go over them all again, especially as the trial judge was limiting the waiver of the statute by defendants to the specific questions asked her by them. There was no abuse of discretion on this point, nor any prejudice. The incompetency of a party to testify imposed under the statute, supra, is waived by the taking of such party's deposition, whether the deposition was ever completed and filed in court or not, where in the taking of such deposition the party is required to testify concerning transactions with the deceased person from whom he acquired his cause of action. Cox v. Gettys, 53 Okl. 58, 156 P. 892; Trent v. Trent, Okl., 270 P.2d 953; Jent v. Brown, Okl., 280 P.2d 1005. The contention made by the four children that they are not bound by such waiver is not tenable; they do not deny that the attorneys who took the deposition did not

represent them at the time same was taken, nor do they disaffirm the general appearance entered on their behalf by said attorneys; the employment of new counsel at a later date cannot serve to erase the actions of former counsel.

■ All appealing parties contend that plaintiff's evidence was insufficient to show her ownership of an undivided one-half interest in the property standing in the name of Joseph Charles Dean at the time the antenuptial contract was entered into. They assert that plaintiff had to deraign her title, and show by proper instruments her ownership as claimed by her, either by deeds, or by probate proceedings in her mother's estate. Plaintiff does not claim to have legal title to the property, which she would have, had deeds been made to her or had probate proceedings distributed an interest in her mother's estate to her. She claims equitable title, through an agreement with her father in the nature of a family settlement, and that this agreement and her ownership of such interest and the fact that her father held such interest in trust for her during his lifetime is evidenced by the antenuptial contract and the will made in conformity therewith. It is immaterial how she acquired ownership if her father acknowledged that she did have such ownership, and that he held legal title thereto in trust for her during his lifetime, she to have full enjoyment thereof at his death. The evidence, and the contract itself, clearly shows that Joseph Charles Dean acknowledged and recognized that Marie Katherine Dean did have ownership of an interest in the property standing in his name at the time of his marriage to Mary Kahanek, and that she would also own a one-half interest in the accumulations and increase therefrom. No other logical interpretation can be placed upon the wording of the contract. By the execution of the contract, Mary Kahanek, now Dean, also knew and recognized Marie Katherine's ownership in said property and the trust relation between her intended husband, Joseph Charles Dean, and his daughter, Marie Katherine. The judgment of the trial court on this point is not clearly against the weight of the evidence.

Appellants further contend that even if plaintiff did own an equitable interest in the property at the time of the marriage of of her father and Mary Kahanek she has lost or become barred from asserting same because (1) her father and Mary Dean rescinded the antenuptial contract, and the instruments rescinding same were attached to defendants' answers; that plaintiff filed no reply, and therefore admitted that the antenuptial contract and will made in conformity therewith was cancelled; (2) that she knew of such rescission and took no steps to enforce her rights within applicable limitation statutes; that the recording of deeds to property taken by her father in his and Mary Dean's name jointly was at least constructive notice to plaintiff of such rescission; (3) that the antenuptial contract being made expressly for her benefit, could only be enforced by her prior to the time that the parties thereto rescinded same, under 15 O.S.1951 § 29.

■ As to the first contention, the affirmative allegations of defendants' answers do not amount to new matter. They merely affirmatively deny the allegations of plaintiff's verified petition. All of the affirmative allegations of defendants' answers could have been proved under a general denial; plaintiff alleged the attempted cancellation of the contract; defendants attached to their answers the instruments by which the attempted cancellation was made; plaintiff alleged she was part owner of the furniture store and worked therein as a manager; defendants alleged she was only a salaried employee and had no other interest. A reply was not necessary. Cox v. Gettys, 53 Okl. 58, 156 P. 892; Stephens v. Conley, 48 Mont. 352, 138 P. 189; 41 Am.Jur. Pleadings, Sections 156, 174–175.

■ Such allegations as made by defendants did not constitute a complete defense to plaintiff's cause of action. The attempted cancellation of the antenuptial contract and contractual features of the will

made in conformity therewith could in no way affect the interest of plaintiff unless she consented thereto. The contract was not one made merely for her benefit; she was actually a party thereto, as shown by the recital of consideration flowing to and from her, specific provisions as to the disposition of her interest in the property in event of her death prior to her father's, and the stipulation that no division of the property was to be made during her father's lifetime. The fact that a copy of the contract was delivered to her is also strong evidence of this point. Under these facts 15 O.S.1951 § 29, can have no application. As between themselves, and as affecting their own interests, Joseph Charles Dean and Mary Dean could cancel and set aside antenuptial contract, but they could not rescind, abrogate, or cancel either the antenuptial contract or the contractual features of the will in comformity therewith insofar as same affected the rights of Marie Katherine without her consent. See In re Greenleaf's Estate, 169 Kan. 22, 217 P.2d 275; Hagerman v. Hagerman, 160 Kan. 742, 165 P.2d 431, wherein a widow executed a will in conformity with a family settlement agreement; she thereafter attempted to rescind the family settlement agreement and executed a new will devising the property in a different manner and to different parties; held, while her revocation of her will made it impossible to probate it as such, it did not abrogate the family settlement contract in consideration of which it was made, and the attempted rescission of the family settlement agreement was ineffective against those parties thereto who had not consented to such attempted rescission. See also Nelson v. Schoonover, 89 Kan. 388, 131 P. 147.

■ Courts look with favor upon family settlement agreements, as a matter of public policy, and they will ordinarily be upheld when made with full understanding of the facts and without fraud, undue influence, or imposition, and this is true even though it might afterward appear that one or more of the parties to such contract actually had no enforceable right. Vinson v. Cook, 76 Okl. 46, 184 P. 97; Scott v. Beams, 10 Cir., 122 F.2d 777. No fraud, undue influence, or imposition is asserted or proved in this case.

■ Plaintiff alleged and proved that she did not know of the attempted rescission and disavowal of the trust relationship between her and her father as to her interest in the property until after her father's death. The attorney for the executrix offered to stipulate in open court that plaintiff did not have knowledge of the cancellation of the antenuptial contract and will made in conformity therewith; even though the stipulation was rejected by the judge because of the objection thereto by the attorneys for the four children, same constituted an admission by counsel during trial; such admissions are a high specie of evidence and cannot be retracted. Oklahoma Natural Gas Co. v. Walker, Okl., 269 P.2d 327. The purchase of two pieces of real property by plaintiff's father in his and his wife's name jointly could not be either constructive or actual notice to plaintiff of her father's repudiation of his trust, so as to start the statutes of limitation running. Her father had ample funds of his own, as plaintiff knew, and the mere purchase of this property in that manner, without more, was not notice that her father was repudiating the trust as to the one-half interest plaintiff owned in the original property and increase therefrom.

■ Where one obtains or retains legal title or right to property under circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the beneficial interest, equity will impress a constructive trust on the property so acquired in favor of the party who is equitably entitled to same. Teuscher v. Gragg, 136 Okl. 129, 276 P. 753, 66 A.L.R. 143; Hayden v. Dannenberg, 42 Okl. 776, 143 P. 859; Renegar v. Brunning, 190 Okl. 340, 123 P.2d 686; Ransdel v. Moore, 153 Ind. 393, 53 N.E. 767, 53 L.R.A. 753.

■ The judgment of the trial court reserved to the executrix the right to show

by proper pleading and evidence that any or all of the property standing in the name of the deceased at his death was not either the original property, subject of the contract and the trust there created, or the increase or accumulations therefrom and therefore not subject to plaintiff's claim of one-half ownership. Such judgment and decree is in accord with our decision in Warden v. Richardson, 203 Okl. 474, 223 P.2d 338. All rights of the executrix and the estate are thereby protected. If any of the property in her hands is not properly subject to the judgment of the court, as not being the original property or its increase or conversion, the executrix may so show upon accounting.

Judgment affirmed.

WELCH, C. J., and DAVISON, JOHNSON, JACKSON and CARLILE, JJ., concur.

HALLEY, WILLIAMS and BLACKBIRD, JJ., dissent.

HALLEY, Justice (dissenting).

The majority opinion here so misconstrues the facts and law in this case I am compelled to dissent.

This is not an involved case as far as the facts are concerned. Joseph Charles Dean married Julia Finnegan on the 11th day of October, 1899, at Louisville, Kentucky. Of this marriage one child, Marie Katherine Dean, now Jelsma, was born on December 15, 1900. Soon after 1900 the family moved to Shawnee, Oklahoma, where Mr. & Mrs. Dean engaged in the bakery business. The Deans accumulated some property. On May 7, 1919, Julia Finnegan Dean died. She left no estate. In August of the same year, Mr. Dean with his daughter moved to Oklahoma City and lived at 627 East Park Place. Marie Katherine Dean continued to live at this address until April, 1924, when she was married to Henry Jelsma and moved to another address.

On October 27, 1922, J. C. Dean in contemplation of marriage to Mary Kahanek, entered into an ante-nuptial agreement with Mary Kahanek. Marie Katherine Dean, now Jelsma, while a contingent beneficiary under this agreement, was not a party to it and did not sign it.

Mary Kahanek and J. C. Dean were married as contemplated and on December 9, 1922, J. C. Dean made and executed a will in which he incorporated the ante-nuptial contract and cancelled all previous wills.

On November 17, 1929, J. C. Dean and Mary Kahanek after the birth of two sons both living, cancelled in writing the ante-nuptial agreement of October 27, 1922. On this same date J. C. Dean executed a new will cancelling all previous wills and ratified the agreement cancelling the ante-nuptial agreement. Thereafter on May 3, 1938, after two more children, a boy and girl, had been born to J. C. Dean and Mary Kahanek Dean, J. C. Dean executed a new will in which he recognized all five of his children. On May 28, 1954, J. C. Dean died at the age of 87 years.

Plaintiff sued her step-mother individually and as executrix of her father's estate and her three half-brothers and one half-sister for one-half of all property, real and personal, that her father owned at the time of his marriage to Mary Kahanek and one-half of all increase thereof. The trial court rendered judgment for the plaintiff which gave her one-half interest in all property shown in the ante-nuptial agreement and all increase that might be traceable to it.

The evidence fails to disclose that plaintiff's mother had any property in her name at her death. Everything was in the father's name. It was never necessary for any of the property that J. C. Dean had at the death of plaintiff's mother to go through the probate court as the property of his wife. It was all his to do with as he pleased.

It is true that the father, J. C. Dean made an ante-nuptial agreement with Mary Kahanek in which plaintiff was mentioned. It is well settled that a marriage settlement or ante-nuptial agreement may be revoked

by the consent of the parties which was done in this case. For the right to revoke see 41 C.J.S. Husband and Wife § 109 and 26 Am.Jur. Husband and Wife, Section 302. The Kansas cases relied upon by the majority to the effect that J. C. Dean and Mary Kahanek Dean could not revoke the ante-nuptial agreement as to Marie Jelsma do not sustain their position. Hagerman v. Hagerman, 160 Kan. 742, 165 P.2d 431, involved an agreement entered into by a married man with his mother and had nothing to do with an ante-nuptial agreement. In re Greenleaf's Estate, 169 Kan. 22, 217 P.2d 275, was a case where a widower, a grown daughter of his and his prospective second wife entered into an ante-nuptial agreement signed by the three, an element that does not exist in the case at bar. This case recognizes the right of the parties to ante-nuptial agreements to revoke the same. More especially would this be true where the ante-nuptial agreement itself contemplates such a possibility and certainly Marie Jelsma did not take as a purchaser in this case.

J. C. Dean at no time placed his property under the control of Marie Katherine. He at no time recognized that she had any right in the property that he owned at his first wife's death. He never at any time placed his property beyond his control and specifically provided that the property should be returned to him if he and Mary Kahanek were to separate. Any right that Marie Katherine got from the ante-nuptial agreement was purely contingent upon the happening of certain events which never happened prior to its revocation. Marie Katherine was never a party or a necessary party to the agreement between J. C. Dean and Mary Kahanek and it was not a family settlement.

Marie Katherine contends that she did not know of the revocation of the ante-nuptial agreement. She was not entitled to know of it. As far as she was concerned it was nothing more than a will and could be revoked at any time by the parties to it. She had expended nothing in order to be mentioned in the agreement.

The terms of the ante-nuptial agreement provided that in case the parties had children provision would be made for them as provided by law or will, which is made plain in this paragraph of the agreement:

"That if there are any direct blood descendants, heirs of the said husband and wife, inheriting through both of them jointly, said heirs shall share first as provided for them by law or will made by the said Joseph Charles Dean at any time, and then the property remaining shall be disposed of in accordance with all the provisions and purposes of this contract and the said will; and of the said will and the said contract the said will shall prevail."

It clearly showed that plaintiff was not to take one-half of the property owned by J. C. Dean at the time of the death of his first wife.

I submit that no irrevocable trust was ever created for plaintiff. The only interest that the plaintiff could have in the property her father had in his name when her mother died would have been a one-fourth of the entire estate as certainly her mother would have had but a half of the estate if it was jointly acquired and in the name of both father and mother. Certainly the husband would have received half of her estate on her death. But here the entire accumulations of J. C. Dean and his first wife were in J. C. Dean. When he married Mary Kahanek everything he owned at the first wife's death was in his name. It continued to be his property. Marie Katherine Jelsma was not deeded any of the property. Neither was the ownership of any personal property in the name of the first wife.

In the case of Jones v. Farris, 180 Okl. 341, 69 P.2d 344, we held as follows:

"Where property jointly acquired during coverture is of record in the name of the husband, no question of resulting trust being involved, and the husband is still living, and the wife has taken no steps to determine her interest therein, it is not such a vested

interest in her as will descend to her children upon her death intestate during the lifetime of her husband, so as to reduce his interest therein."

This case was tried as one of equitable cognizance. In such case it is our duty to weigh the evidence and render that judgment that should have been rendered. It is impossible for me to see under the evidence how any Chancellor would give one child a lion's share as was done in this case. It is plain that all the property appearing in J. C. Dean's name at his first wife's death was his and the only possible claim Marie Katherine Jelsma could assert to the property must be by the antenuptial agreement.

There is nothing in the ante-nuptial agreement that indicates in any way that J. C. Dean considered that Marie Katherine owned any interest in the property when the agreement was executed.

I have read the record and there is no evidence shown that would sustain the conclusion of facts and law that the trial court entered in this case. The only evidence that plaintiff had was her own made by deposition and the man from whom J. C. Dean purchased the Capitol Furniture Company and a friend who lived neighbors to the plaintiff and her father before plaintiff's marriage. The plaintiff testified that her mother told her "that what was hers was mine." I submit that this is no evidence that the half of the property that stood in the name of J. C. Dean belonged to his first wife. Neither is there any evidence that Marie and her father entered into a family agreement, the statement in the majority opinion to the contrary notwithstanding.

At no time did J. C. Dean acknowledge that any property belonged to Marie. He was said to have stated that she had a store which could only mean that it would go to her if he died. This whole picture changed when he married the second time.

The demurrer to the evidence by defendants or motion for judgment by the defendants should have been sustained as

there is no evidence that would sustain the judgment rendered by the trial court in this case. I dissent.

I am authorized to state BLACKBIRD, J., concurs in the views expressed herein.